UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY LYNN HERRON,

      Plaintiff                        Civil Action No.  15-11825

v.                                HON. DENISE PAGE HOOD
                                    U.S. District Judge
                                    HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Sherry Lynn Herron ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On March 9, 2012, Plaintiff filed applications for SSI and DIB, alleging disability as of August 4, 2006 (Tr. 249-251, 252-258).  After the initial denial of the claim, Plaintiff filed a  request for an administrative hearing, held on July 23, 2013 in Flint, Michigan before Administrative Law Judge ("ALJ") Kevin W. Fallis (Tr. 46).  Plaintiff, represented, testified

(Tr. 56-104), as did Vocational Expert ("VE") Kimberly Warner (Tr. 104-111).   On
November 14, 2013, ALJ Fallis found Plaintiff not disabled, determining that Plaintiff's
condition had not materially changed since an earlier, May 19, 2009 administrative denial
of benefits (Tr. 22, 37, 138-149)(*citing Drummond v. CSS,* 126 F.3d 837 (6th Cir. 1997)).   On
March 16, 2015, the Appeals Council denied review (Tr. 1-3).   Plaintiff filed for judicial
review of the final decision in this Court on May 20, 2015.

## BACKGROUND FACTS

Plaintiff, born March 17, 1971, was 42 when ALJ Fallis issued his decision (Tr. 37,
249).   She completed 12th grade and worked previously as a nurse's aide (Tr. 280).   She
alleges disability as a result of a mitral valve replacement, fatigue, pain, cognitive problems,
depression, left eye problems, arthritis, headaches, extremity numbness and tingling (Tr.
279).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by amending the alleged onset of
disability date to May 20, 2009, one day after the prior administrative determination* (Tr.
51).

Plaintiff then offered the following testimony:

She lived in Flint, Michigan (Tr. 56).   She had gained 60 pounds in the last two years
and currently weighed 210 (Tr. 57).   She was left-handed (Tr. 57).   She did not use the
basement of her house and relied on her son or husband to do laundry (Tr. 58).   Her husband
was disabled due to schizophrenia (Tr. 58).   She relied on her son, 20, to help her with
household chores (Tr. 58).   She had not held a driver's license since receiving a DUI
conviction in 2006 (Tr. 58).   She relied on her mother or sisters for transportation (Tr. 59).
She took a bus to the hearing, but did not use public transportation regularly (Tr. 59).

-2-

Plaintiff graduated from high school and received training as a medical assistant and as a cosmetologist (Tr. 59-60).  On weekends, she cared for the daughter of a friend with cerebral palsy for 10 hours, receiving a stipend from the State of Michigan (Tr. 61).  She previously worked full time at a factory (Tr. 63).  The factory job involved lifting of no more than five pounds but required her to be on her feet all day (Tr. 64).  She occasionally helped her mother plant flowers (Tr. 69).

Plaintiff experienced the medication side effects of light-heatedness and fatigue (Tr. 70).  She had recently reduced dosages, but had not yet seen an improvement (Tr. 71).  She believed that her disability was due primarily to fatigue resulting from her heart valve condition (Tr. 72).  She had mitral and aortic valve replacements in 2006 but continued to experience chronic fatigue as well as chest pain approximately once every two weeks (Tr. 73).  She alleviated the chest pain with nitroglycerin (Tr. 73).  She also experienced mood swings and had received treatment from a psychiatrist since May, 2012 (Tr. 74).

*Plaintiff's counsel interjected that her client was experiencing valve deterioration resulting in uncontrolled hypertension and mild mitral valve regurgitation and moderate to severe regurgitation in the aortic valve* (Tr. 76).  *She noted that a treating source recently found that due to the valve condition, Plaintiff was limited to working part-time* (Tr. 77). *She noted further that since a previous application for benefits was decided, Plaintiff had been diagnosed with bipolar disorder* (Tr. 77).  *She stated that Plaintiff's failure to take heart medication regularly was due to financial and mental health issues* (Tr. 79).

Plaintiff resumed her testimony:

Because of transportation limitations, she was unable to have her blood checked every day as recommended by her treating source (Tr. 80).  She would be unable to lift one-and-a-half pounds on a continuous basis (Tr. 86).  She was unable to stand for more than an hour

-3-

at a time due to foot swelling (Tr. 86). She was unable to walk even one block due to shortness of breath (Tr. 87). She spent most of the day reclining, watching television, or performing light household chores (Tr. 87). She did not shop more than once a month and was unable to lift grocery bags (Tr. 88-89). Her regular outings were limited to church once a week (Tr. 90). She used a computer around twice a week to check Facebook or to obtain information on gardening (Tr. 91-92). She enjoyed making decorative keychains (Tr. 93). She experienced occasional reading comprehension problems (Tr. 92). She had not traveled out-of-state since 2009 except to attend a funeral in Ohio and that during the trip, she required four stops to stretch over the course of the four-hour drive (Tr. 93). She smoked one or two cigarettes every two or three days (Tr. 95). She had not drunk alcohol or used marijuana in the past year but admitted to one-time cocaine use the previous December after experiencing marital problems (Tr. 95-96). She was convicted of shoplifting at the age of 18 (Tr. 96).

In response to questioning by her attorney, Plaintiff stated that her condition had worsened since May, 2009 (Tr. 97). Psychotropic medication caused concentrational problems (Tr. 98). She attended AA meetings and had worked with an addiction counselor (Tr. 104).

### B.   Medical Evidence[1]

### 1.  Treating Records

### a.  Records Predating May 20, 2009

July, 2006 hospital records note that Plaintiff admitted to past cocaine abuse and current tobacco use (Tr. 321). The following month, Plaintiff underwent valve replacement

---

[1]Records predating the alleged onset date (amended) of May 20, 2009 are included for background purposes only.

surgery (Tr. 326-328).  September, 2006 post-operative notes by G. Predeteanu, M.D. state that Plaintiff's incision from aortic and mitral valve replacement was well healed and that the vital signs were normal (Tr. 317). In August, 2007, Dr. Predeteanu noted "prosthetic valve disfunction with aortic insufficiency" (Tr. 318).  He found that the condition was not severe enough to warrant replacing the valve (Tr. 318).  The following month, Plaintiff admitted to continued tobacco use (Tr. 330).  G. Michael Deeb, M.D. found "moderate -to-severe aortic insufficiency" (Tr. 331).   The following month, he found "mild-to-moderate" aortic regurgitation (Tr. 332).

   **b. Records Pertaining to the Relevant Period**

   April, 2009 treating records by P. Kerseri, M.D. and Cristian Hutanu, M.D. note reports of recent shortness of breath and heart palpitations (Tr. 589-590).  Plaintiff reported that her grandmother passed away the day before (Tr. 590, 872).  Plaintiff denied chest pains (Tr. 590).  The following month, Plaintiff again reported shortness of breath but denied chest pains (Tr. 586).  An MRA of the carotid arteries was unremarkable (Tr. 601).  An MRI of the brain was also unremarkable except for a small lesion (Tr. 660).

   Plaintiff sought emergency treatment in September, 2009 for a superficial stab wound to the abdomen (Tr. 419, 424, 864).  A chest examination was unremarkable (Tr. 426).  The following month, she reported chest pain (Tr. 579).  Dr. Kerseri noted "chronic shortness of breath" upon moderate physical activity such as "walking one to two blocks," but noted that Plaintiff reported that she could "do all the house chores with no problems" (Tr. 579, 861). A chest x-ray was unremarkable (Tr. 654).  Later the same month, she reported a cessation of chest pain (Tr. 576).  At the end of the month, she denied shortness of breath or chest pain (Tr. 573, 855).

A January, 2010 echocardiogram, taken in response to an episode of dizziness (Tr. 569), showed mild aortic and mitral valve regurgitation (Tr. 360, 699). An ultrasound of the carotid artery was normal (Tr. 380, 700). Saad Sirop, M.D. noted that May, 2009 MRI and MRAs were normal (Tr. 850). Dr. Predeteanu found that Plaintiff was "doing fairly well," but complained of occasional lightheadedness, shortness of breath and chest pain (Tr. 376, 851). He found that Plaintiff's mental status was good (Tr. 377). June, 2010 treating notes state that Plaintiff was "poorly compliant" with office visits and medication checks (Tr. 565). The following month, Plaintiff was cautioned to improve compliance with medication orders (Tr. 562). In August, 2010, her cardiac condition was deemed "very good" (Tr. 721). October, 2010 treating records state that Plaintiff, now compliant with medication instructions, denied shortness of breath of other cardiac symptoms (Tr. 560). Treatment notes from the following month state that Plaintiff was again non-compliant with office visits and medication instructions (Tr. 556, 839). In March, 2011, Dr. Predeteanu noted that an EKG was unremarkable (Tr. 718). He increased her dosage of Atenolol in response to complaints of chest pain (Tr. 718). A September, 2011 echocardiogram showed an ejection fraction of 60 to 65 percent with moderate to severe aortic regurgitation (Tr. 344-345, 781-782). The same month, a stress test was terminated due to shortness of breath, but showed normal results (Tr. 346-347, 696-696, 780). A physical examination the following month was unremarkable (Tr. 716).

February, 2012 treating notes state that Plaintiff denied cardiac symptoms but reported depression (Tr. 538, 820). Talluri Siva, M.D. prescribed Zoloft (Tr. 537). In March, 2012, Plaintiff sought emergency treatment for chest pain (Tr. 389-390, 518, 535, 817). An EKG was normal (Tr. 693). Plaintiff admitted to current tobacco use (Tr. 392). She was discharged after her symptoms improved (Tr. 390). Imaging studies of the heart performed

-6-

the same month were unremarkable (Tr. 648, 650).  Treating notes from the following month state that the chest pains had resolved (Tr. 758, 814).

May, 2012 counseling notes by Jodi Barnes, M.A. state that Plaintiff experienced depression, nightmares, anger, mood swings, trauma, and relationship problems (Tr. 1009). She admitted to recent alcohol and marijuana use (Tr. 1013).  Plaintiff appeared fully oriented with an intact memory (Tr. 1016).  She admitted to previously shoplifting charge-cards and drunk driving charges (Tr. 1018).  She reported auditory hallucinations (Tr. 1022). The intake records note that Plaintiff did not require residential services (Tr. 1025).  She was assigned a GAF of 55 due to bipolar disorder with psychotic features and polysubstance dependence[2] (Tr. 1029).  C. Kremer found assigned a GAF of 35[3] (Tr. 1033).

Dr. Predeteanu's August, 2012 records note Plaintiff's complaints of chronic fatigue "moderately" limiting activities (Tr. 770).  He advised Plaintiff to lose weight, increase physical activity, and make good dietary choices (Tr. 774).  The same month, emergency imaging studies of the chest, taken in response to chest pain and shortness of breath, were deemed "worrisome for congestive heart failure" (Tr. 895, 897).  Plaintiff was diagnosed with acute pulmonary edema (Tr. 939).  Treating records note a normal mood and affect (Tr. 929).  Imaging studies from the following day showed "mild pulmonary vascular congestion, significantly improved . . ." from the previous day's result (Tr. 899).  Doppler studies showed

---

[2]A GAF score of 51–60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* ("*DSM–IV–TR* "), 34 (4th ed.2000).

[3]A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood."  "*DSM–IV–TR*" at 34.

"trivial to mild" mitral regurgitation (Tr. 903, 980).

November, 2012 records note "normal heart sounds" with an ejection systolic murmur in the aortic area (Tr. 796). The same month, Plaintiff sought emergency treatment for shortness of breath, palpitations, and chest discomfort after using cocaine (Tr. 959). She admitted to continued tobacco use and reported that she administered private care to a handicapped individual (Tr. 960). She was diagnosed with "acute exacerbation of congestive heart failure likely secondary to cocaine use" (Tr. 962). Imaging studies of the chest showed vascular congestion consistent with congestive heart failure (Tr. 976, 1004).

April, 2013 treating notes note clear lungs and no edema (Tr. 786). The following month, Dr. Predeteanu completed an assessment of Plaintiff's physical abilities, finding that she could walk stand or sit for no more than a total of four hours in an eight-hour workday, and was limited to lifting five pounds frequently and 10 occasionally (Tr. 879). He did not find any manipulative limitations, but found that Plaintiff was unable to push or pull with the lower extremities on a sustained basis (Tr. 879-880). He found that she would be required to rest for 20 minutes each hour, but did not need to recline for significant periods (Tr. 880). A June, 2013 mental health assessment resulted in a GAF of 49[4] (Tr. 1038). In August, 2013, Dr. Predeteanu stated that the limitations that he found in May, 2013 (*see above*) existed as of the alleged onset date of May 20, 2009 (Tr. 1043-1044).

## 2. Non-Treating Records

In May, 2012, Karen Marshall, Psy.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's reported of chronic depression and

---

[4]A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

fatigue (Tr. 766). Plaintiff also reported "seeing stars" and "having chest pain" (Tr. 766). She reported a recent weight gain of 20 pounds (Tr. 766). Plaintiff alleged that she became fatigued doing housework and grocery shopping (Tr. 767).

Dr. Marshall noted that Plaintiff appeared depressed but was fully oriented (Tr. 767). She concluded that Plaintiff would be able "to understand, remember and complete simple repetitive tasks" but "may be more withdrawn due to her feelings of worthlessness" due to her physical limitations (Tr. 768). Dr. Marshall assigned Plaintiff a GAF of 55 (Tr. 769).

The same month, Elaine M. Tripi, Ph.D. examined Plaintiff and administered intelligence testing, classifying Plaintiff in the "low average" range of intelligence (Tr. 882). Dr. Tripi assigned a GAF of 47, opining that Plaintiff was "not a viable rehabilitation candidate or capable of substantial gainful activity based on her "physical and emotional complaints" (Tr. 883). She found that Plaintiff was markedly limited in the ability to understand, remember, or carry out detailed instructions; maintain concentration or be punctual; complete a work-period without psychologically-related interruptions; travel to unfamiliar places; or use public transportation (Tr. 1039-1041).

Also in May, 2012, Elaine Pinaire, Ph.D. completed a non-examining psychological evaluation on behalf of the SSA, finding that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence or pace (Tr. 161-162). Dr. Pinaire found that Plaintiff could "understand, remember, and carry out simple instructions" consistent with unskilled work (Tr. 166). The following month, U. Gupta, M.D. performed a non-examining review of Plaintiff's treating and consultative records on behalf of the SSA, finding that Plaintiff could lifting 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday, and push and pull without limitation (Tr. 164). He found no other limitations (Tr. 164).

-9-

### C.    Vocational Expert Testimony

VE Kimberly Warner classified Plaintiff's past relevant work as a nurse aide as exertionally medium and semiskilled[5] (Tr. 105-106, 307).   The ALJ then described a hypothetical individual of Plaintiff's age, educational level, and work experience:

> [T]his individual is limited to light work.   They'd be able to lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently, stand and walk for about six hours and sit for up to six hours in an eight-hour work day with normal breaks.   They could never perform pushing or pulling.   They can never operate foot controls.   They could never climb ladders, ropes, or scaffolds. They could occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, and crawl.   They would have to avoid all exposure to extreme cold, extreme heat, and to humidity.   They would have to avoid concentrated exposure to excessive vibration.   They would have to avoid concentrated use of hazardous moving machinery, and avoid all exposure to unprotected heights.   Additionally, the work is limited to simple, routine, repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions and routine workplace changes. There could only be occasional and superficial interaction with the public. (Tr. 106-107).

The VE testified that the above-limited hypothetical individual could not perform Plaintiff's past relevant work, but could perform the light, unskilled work of a sorter (11,000 positions in the State of Michigan); inspector (5,800) and bench assembler (12,000) (Tr. 107-108).   The VE testified that if the limitations included the need for a sit/stand "at will" option, the bench assembly positions would be reduced by half but the job numbers would be otherwise unchanged (Tr. 108).

The VE testified further that if the individual described in the original query were

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

-10-

limited to sedentary work, she could perform the work of a sorter (sedentary) (2,100); inspector (4,800); and document preparer (2,200) (Tr. 108-109). She testified that the need for a sit/stand at will option would not change the sedentary findings (Tr. 109). The VE testified that the need to be off task for 20 percent of the work day, or, the need to miss two days of work each month due to "doctor visits, symptoms," or medication side effects, would preclude all work (Tr. 109-110).

In response to questioning by Plaintiff's counsel, the VE testified that the need to take a rest period for 20 minutes each hour, or, the inability to sit, stand, or walk for more than a total of four hours in an eight-hour workday would preclude all work (Tr. 110-111).

### D. The ALJ's Decision

Citing *Drummond v. CSS,* 126 F.3d 837 (6th Cir. 1997), the ALJ found that Plaintiff's condition had not materially worsened since the prior May 19, 2009 administrative decision (Tr. 22, 138-149). He found that Plaintiff was last eligible for DIB on March 31, 2008 (Tr. 22). ALJ Fallis determined that Plaintiff experienced the severe impairments of "aortic and mitral valve insufficiency status post valve replacement, obesity, bipolar disorder and substance abuse in remission" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 24, 35). He found that the conditions of dyslipidermia, hypertension, vision problems, ovarian cyst and dermatitis would not create more than minimal work limitations (Tr. 25). He found that Plaintiff experienced moderate restriction in activities of daily living, social functioning, and in concentration, persistence, or pace (Tr. 35-36). He found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with the following restrictions:

> [Requires no more than standing/walking for about six hours in an eight-hour work day; allowing person to sit or stand alternatively, provided this person is not off task more than 10 percent of the work period. Never perform pushing

-11-

or pulling or operate foot controls.  Never climb ladders, ropes or scaffolds. Can perform occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching and crawling.  Must avoid all exposure to extreme cold, heat and humidity.  Avoid concentrated exposure to excessive vibration and use of hazardous moving machinery.  Must avoid all exposure to unprotected heights.  Work is limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work related decisions and routine work place changes; and only occasional superficial interation with the public (Tr. 36-37).

Citing the VE's testimony, the ALJ found that although Plaintiff was unable to perform her former work, she could work as a sorter, inspector, or bench assembler  (Tr. 41).

The ALJ found that Plaintiff's allegations of disability were undermined by her partial compliance with treatment for the valve conditions (Tr. 38).  He noted that Plaintiff continued to smoke and had used cocaine as recently as November, 2012 (Tr. 38).  He noted further that an April, 2013 examination showed "clear lungs and no edema" (Tr. 38).  He cited August, 2012 studies showing an ejection fraction of 67 percent (Tr. 38).

The ALJ accorded only "moderate weight" to Dr. Predeteanu's May, 2013 assessment, finding that it was inconsistent with the medical record (Tr. 39).  He also found that Plaintiff's psychological symptoms did not preclude work, citing Dr. Marshall's consultative finding that she was fully oriented with an intact memory (Tr. 39).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6ᵗʰ Cir. 1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and

"presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-13-

## ANALYSIS[6]

### A.  The Treating Physician Analysis

Plaintiff argues first that the ALJ failed to provide an adequate rationale for the partial rejection of Dr. Predeteanu's May, 2013 assessment of her work-related abilities.  *Plaintiff's Brief,* 12-17, *Docket #17.*

As the VE testified, Dr. Predeteanu's May, 2013 finding  that Plaintiff could walk stand or sit for no more than a total of four hours in an eight-hour workday, or his finding that Plaintiff needed to recline for 20 minutes each hour (Tr. 879-880), if adopted, would direct a finding of disability (Tr. 110-111).  Dr. Predeteanu also found that Plaintiff was limited to lifting up to five pounds frequently and up to 10 occasionally and was not able to

--------

[6]

Acknowledging the prior administrative decision of May 19, 2009, ALJ Fallis performed his analysis pursuant to Acquiescence Ruling ("AR") 98-4(6)*,* which states that in the absence of new and material evidence postdating an earlier decision under the same Title, the latter fact finder *must* adopt the previous RFC (Tr. 37)(emphasis added).  AR 98-4(6), codifying *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997) provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding.

In order to be awarded benefits subsequent to the original finding of non-disability, a claimant "must demonstrate that her condition has so worsened . . . that she was unable to perform substantial gainful activity." *Priest v. Social Security Admin*, 3 Fed.Appx. 275, 276, 2001 WL 92121, *1 (6th Cir. January 26, 2001)(citing *Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1232-33 (6th Cir.1993)).

use leg-controlled equipment for pushing or pulling on a sustained basis (Tr. 879-880).

The failure to articulate "good reasons" for rejecting a treating physician's opinion regarding a claimant's medical condition constitutes reversible error. *Gayheart v. CSS*, 710 F.3d 365, 376 (6th Cir. 2013); *Wilson v. CSS,* 378 F.3d 541, 544 (6th Cir. 2004); § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart*, at 376.

The ALJ accorded "moderate weight" to Dr. Predeteanu's opinion (Tr. 33). He agreed with Dr. Predeteanu's finding that Plaintiff did not experience manipulative limitations but rejected the finding that Plaintiff was limited to lifting five pounds (Tr. 33). He cited March, 2012 records showing full strength in all extremities and the lack of neurological deficits (Tr. 33). The ALJ noted that it was unclear whether Dr. Predeteanu considered Plaintiff's abuse of cocaine in making the residual capacity findings (Tr. 33, 35).

The ALJ supplemented his rationale for rejecting Dr. Predeteanu's assessment later in the administrative determination (Tr. 37-38). The ALJ noted that the assessment was undermined by Plaintiff's ability to care for her personal needs, perform light housekeeping chores, attend church, visit her mother, use a computer, and attend AA meetings (Tr. 37-38). The ALJ noted that Dr. Predeteanu's assessment (including the finding that Plaintiff needed to rest of 20 minutes of each hour) stood at odds with both Plaintiff's admitted activities and the treating notes stating that Plaintiff's intermittent health crises were attributable to her failure to follow medical advice (Tr. 38). The ALJ noted that Dr. Predeteanu's May, 2013

-15-

assessment also stood at odds with his August, 2012 advice for Plaintiff to increase her physical activity (Tr. 38).

Plaintiff's criticisms of the ALJ's treating physician analysis do not provide a basis for remand. She faults the ALJ for citing only the March, 2012 medical records to support the partial rejection of Dr. Predeteanu's opinion, arguing that the March, 2012 finding of full muscle strength is irrelevant to the question of whether the cardiac condition caused disabling limitation. *Plaintiff's Brief* at 14. Contrary to Plaintiff's argument, the ALJ supported the partial rejection of Dr. Predeteanu's opinion with other medical evidence. The ALJ's conclusion that "the overall record does not support [Dr. Predeteanu's] opinion and assessment" is directly prefaced by a citation to an April, 2013 cardiac follow-up examination "showing no chest abnormalities, clear lungs and no edema" (Tr. 38). The ALJ pointed out that as of April, 2013, no surgery had been recommended and that no physician had recommended that Plaintiff required daily rest periods (Tr. 38). The finding that Dr. Predeteanu's assessment was not supported by the "overall record" is prefaced by the ALJ's observation that Plaintiff was able to engage in a wide variety of daily activities (Tr. 37-38). The ALJ noted that Dr. Predeteanu's August, 2012 recommendation for Plaintiff to "increase her physical activity" stood at odds with the May, 2013 assessment. Notably, in May, 2012, a psychological intake interviewer concluded that Plaintiff did not require "residential services" for help taking care of her personal or household needs (Tr. 1025).

For the same reasons, the ALJ did not err by instead adopting Dr. Gupta's non-examining finding that Plaintiff was capable of a significant range of light work (Tr. 39, 164). *See Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir. 2009)( "'In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources.'" *Blakley v.*

-16-

*Comm'r Of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)(*citing* SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996)).  Dr. Gupta's finding that Plaintiff was capable of a significant range of exertionally light work is supported by both the medical records and Plaintiff's ability to engage in a fairly wide range of activities, including part-time work.

Plaintiff also faults the ALJ for discounting Dr. Predeteanu's opinion on the basis that it was unclear "whether the Doctor was aware of or considered" Plaintiff's cocaine abuse (Tr. 33).  *Plaintiff's Brief* at 15.  She contends that if the ALJ believed that the substance abuse played a role in causing the disability, he was required to make a disability finding before "discounting or disregarding the assumed effects" of the substance abuse.  *Id.* (*citing* 20 C.F.R. § 404.1535.   In her response to Defendant's arguments, she argues that "substance abuse should have been considered as contributing to disability instead of being used to minimize the degree of disability."  *Docket #19* at 6.

Section 404.1535(a) states that "If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." *Id.*; § 416.935.  If so, the ALJ then determines "whether drug addiction or alcoholism is a contributing factor material to the determination of disability" and whether the claimant would still be disabled is s/he "stopped using drugs or alcohol." § 404.1535(b).  Thus, prior to finding that substance abuse is a "contributing factor" to the disability, the ALJ must make a threshold finding that the claimant is disabled.  *Id.*

Plaintiff's argument is without merit.  First, while the ALJ permissibly noted that Plaintiff's health problems were exacerbated by substance abuse prior to and at one point during the relevant period, he factored the limitations resulting from the medical conditions *and* drug abuse in finding that she was capable of a significant range of exertionally light

work (Tr. 36).  *See Warren v. Comm'r of Soc. Sec.,* 2015 WL 1245936, *20 (E.D. Mich. Mar. 18, 2015)("Because plaintiff was found not to be disabled [even when considering the effects of substance abuse] the ALJ was not required to decide the issue of whether substance abuse was material to a finding of disability").[7]

Moreover, the ALJ's observation that Dr. Predeteanu's assessment did not demarcate between limitations caused by drug abuse and other conditions, by itself, does not suggest that the ALJ used the drug abuse prematurely to support a non-disability finding.  Notably, the ALJ found that that the substance abuse was "in remission" (Tr. 25), notwithstanding a one-time relapse in November, 2012.  The ALJ did not err in observing that Dr. Predeteanu may have over-relied on limitations caused by the isolated relapse in making the assessment, which was made purportedly for assessing limitations resulting from heart disease.  While Plaintiff attempts to frame the issue as one where the ALJ improperly discounted the drug abuse-related limitations before making a disability finding, a more reasonable interpretation is that the ALJ discounted Dr. Predeteanu's opinion (in part) on its possible overemphasis on a one-time event rather than Plaintiff's ongoing limitations.

Finally, even assuming that the "drug abuse" criticism of Dr. Predeteanu's opinion lacked merit, the ALJ provided numerous additional reasons for discounting the treating assessment.  As such, the ALJ's treating physician analysis does not provide grounds for

---

[7]

Plaintiff relies on *Williams v. Barnhart*, 338 F. Supp. 2d 849, 862-863 (M.D. Tenn. 2004) in support of her reliance on § 404.1535.  The *Williams* court remanded the case because the ALJ found that the claimant's polysubstance abuse was "'material'" to the determination; "that is . . . would not be disabled is she stopped the polysubstance abuse" but nonetheless went on to finding the claimant not disabled.  *Id.*  In contrast here, the administrative opinion contains no indication that the ALJ found that substance abuse was the "but for" cause of the disability.   Rather, he found that she was not disabled *notwithstanding* her cocaine use (Tr. 25-26).  *See Warren, supra.*

remand.

### B. The Mental Limitations

Plaintiff also faults the ALJ for discounting Dr. Tripi's May, 2013 consultative examination and intelligence testing. *Plaintiff's Brief* at 17-19. She notes that while Dr. Tripi found that Plaintiff's scores were "low average," the intellectual limitations were not reflected in the RFC. *Id.* at 17-18. However, as noted by Defendant, Plaintiff does not suggest how the RFC could be modified to better reflect "low average" intelligence scores. The RFC for "simple, routine and repetitive tasks," as found by the ALJ (Tr. 36-37) is wholly consistent with Dr. Marshall's consultative findings (Tr. 768). *Defendant's Brief,* 15-16, *Docket #18.* Further, the ALJ did not err by rejecting Dr. Tripi's finding of "marked" psychological limitations by noting that Plaintiff's activities and the treating records pointed to a lesser degree of mental limitation (Tr. 377, 553, 726, 1016). The ALJ also observed that Dr. Tripi's finding that Plaintiff experienced "marked" limitation in the ability to use public transportation (Tr. 1041) was contradicted by Plaintiff's testimony that she was able to travel by herself on a bus to attend the administrative hearing (Tr. 59). The finding that Plaintiff was capable of simple and routine work is also supported by Plaintiff's testimony that she was able to work as a care giver for approximately 10 hours a week (Tr. 61).

Plaintiff points out that treating source Dr. Kremer's October, 2012 assignment of a GAF score of 35 (*see fn 3, above*) supports Dr. Tripi's finding of finding of multiple marked limitations. However, the ALJ's omission of mention of the October, 2012 GAF does not warrant remand. "[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place." *Kornecky v. Commissioner of Social Security,* 167 Fed.Appx. 496, 511 (6th Cir. February 9, 2006). Moreover, the ALJ "failure" to acknowledge the one-time GAF score of 35 does not warrant remand. *Kornecky*

at 507-508 (*citing Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999))("'ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party'").   Moreover, the mental health treating records, noting an intact memory and full orientation, support a lessor degree of limitation (Tr. 1016).   Accordingly, the ALJ did not err in concluding that Plaintiff was capable of a significant range of unskilled work.

My recommendation to uphold the Commissioner's decision should not be read to trivialize Plaintiff's limitations as a result of mitral and aortic valve disease.   However, because the decision that Plaintiff was not disabled falls within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and  that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

-20-

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: July 6, 2016

CERTIFICATE OF SERVICE

I hereby certify on July 6, 2016 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants July 6, 2016.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen

-21-